**BROTHERHOOD OF LOCOMOTIVE
FIREMEN AND ENGINEMEN**
and H. E. Gilbert, Appellants,

v.

**BANGOR & AROOSTOOK RAILROAD
COMPANY et al., Appellees.**

No. 20316.

United States Court of Appeals
District of Columbia Circuit.

Argued Sept 29, 1966.

Decided May 12, 1967.

As Amended Sept. 18, 1967.

See also D.C., 258 F.Supp. 346.

way and William H. Dempsey, Jr., Washington, D. C., were on the brief, for appellees.

Before DANAHER, Circuit Judge, BASTIAN, Senior Circuit Judge, and LEVENTHAL, Circuit Judge.

BASTIAN, Senior Circuit Judge:

This is an appeal from a District Court order entered June 15, 1966, upon motion of the plaintiff-appellee railroads,[1] assessing fines against the defendant-appellants, Brotherhood of Locomotive Firemen and Enginemen (BLF&E) and its president, H. E. Gilbert.[2] These fines were assessed for failure to terminate the contempts of which appellants had been adjudged guilty by a previous order of the court, due to violation of the court's temporary and supplemental restraining orders against a strike.

The restraining orders, the contempt conviction, and the fine assessment arose out of the consolidated merits proceedings now on appeal in Bhd. of Locomotive Firemen & Enginemen v. Bangor & Aroostook R.R., No. 20,192 on the docket of this court.[3]

Mr. Joseph L. Rauh, Jr., Washington, D. C., with whom Messrs. John Silard, Daniel H. Pollitt, Isaac N. Groner, David Epstein and Stephen E. Moss, Washington, D. C., were on the brief, for appellants.

Mr. Francis M. Shea, Washington, D. C., with whom Messrs. Richard T. Con-

As much of the history of the long pending dispute between the railroads and the unions hereinafter referred to will be found in the merits case decision filed this day, this opinion will not duplicate any more of the facts than are necessary to an understanding of the issue herein. The pertinent facts follow:

1. The plaintiff-railroads listed in the Motion for Order Assessing Fines are: Boston and Maine Corporation, Central of Georgia Railway Company, Grand Trunk Western Railroad, Illinois Central Railroad Company, Missouri Pacific Railroad Company, Pennsylvania Railroad Company, Seaboard Air Line Railroad Company, Spokane International Railroad Company, Union Pacific Railroad Company, and Texas and Pacific Railway Company.

2. The judgment for the two fines for one day was first entered in the court's oral, and subsequently written, opinion of June 9. Bangor & Aroostook R.R. v. Bhd. of

Locomotive Firemen & Enginemen, 255 F.Supp. 476 (D.D.C.1966).

3. Four of the merits cases now before us, Nos. 20192, 20193, 20215 and 20216, were consolidated by order of this court dated July 1, 1966. These are cross-appeals from identical judgments entered May 12, 1966, in two consolidated District Court cases, Civ.A.Nos. 777–66 and 784–66, as enunciated by that court's opinion of May 5. Bangor & Aroostook R.R. v. Bhd. of Locomotive Firemen & Enginemen, 253 F. Supp. 682 (D.D.C.1966). The contempt action arose from these proceedings now before us on cross-appeals and further consolidated for argument with seven additional appeals cases.

Following almost five years of failure by most of the railroads and the five operating unions to settle their dispute concerning the manning of trains and engines in freight service,[4] Congress passed Public Law 88–108, 77 STAT. 132 (1963). Pursuant to the provisions of that statute, Arbitration Board No. 282 was convened, and its award covering both engine and train service employees was issued on November 26, 1963, to become effective 60 days later (January 25, 1964) and to continue in effect for two years thereafter (until January 24, 1966). Agreements were then reached among the carriers party to the award and the BLF&E, as well as the Brotherhood of Locomotive Engineers (BLE), both unions representing the engine service employees, whereby the award would continue in force through March 30, 1966, for the parties to the agreements. Thus, the award expiration date for engine service employees was March 31, 1966.

On January 19, 1966, 178 railroads[5] filed suit in the United States District Court for the District of Columbia seeking a declaration that the rules and procedures of the award would be continued in effect after its expiration date.[6] That action, however, concerned only train service employees, and was filed against only the three unions representing those employees.

On February 17, 1966, the BLF&E engine service employee's union filed suit in the Northern District of Illinois for a declaratory judgment that the same Arbitration Award would have no effect after March 30.

Finally, on March 24, the merits case in which the order here on appeal was entered was filed by 181 railroads in the United States District Court for the District of Columbia against BLF&E, again seeking declaratory and injunctive relief regarding work rules to be in effect upon expiration of the award, this time for engine service employees. Also on March 24, the District Court for the Northern District of Illinois granted a motion filed in that court on February 28 by the defendant railroads, pursuant to which the Illinois BLF&E suit was transferred to the District of Columbia.[7] That suit was then consolidated with the engine service employees' case here.

The first anti-strike temporary restraining order was issued against the BLF&E on Monday, March 28, on motion of the railroads. The order forbade a strike "over any dispute as to the agreements, rules, regulations, interpretations, or practices to be applied by plaintiffs upon the expiration of [the award]." During the hearing on this motion, the BLF&E requested that Judge Holtzoff send the case to another judge since some statements in his March 3 opinion relating to train service employees, *supra* note 7, included matters "affecting the Firemen, when they were not a party

4. The dispute covered manning of both the trains and, separately, the engines. Five different unions represent the men affected in these two separate manning issues: engine service employees—Brotherhood of Locomotive Firemen and Enginemen, and Brotherhood of Locomotive Engineers; train service employees—Order of Railway Conductors and Brakemen, Brotherhood of Railroad Trainmen, and Switchmen's Union of North America.

5. Later, on February 3, 1966, the action was dismissed respecting 33 of these carriers.

6. That case is before us on cross-appeals in Akron & Barberton Belt R.R. v. Bhd. of Railroad Trainmen, Nos. 20152, 20172,

from the District Court's judgment of April 6 and opinions of March 3 and 28. Akron & Barberton Belt R.R. v. Bhd. of Railroad Trainmen, 250 F.Supp. 691 (D. D.C.1966), and 252 F.Supp. 207 (D.D.C. 1966).

7. The BLF&E opposed the motion to transfer on the ground that, although at that time only the train service employees' case, to which the BLF&E was not a party, was before the District of Columbia District Court, both at oral argument in the District of Columbia and in his written opinion of March 3 the District Judge had indicated that the engine service firemen might also be affected by any rulings in that case.

to the case." This request was not allowed.[8]

The BLF&E filed in this court a motion for stay of the temporary restraining order on March 30, and we denied the motion and dismissed the appeal on the same date.

On Thursday, March 31, the BLF&E went on a strike which was declared to be solely in regard to a proposed fireman-training program unrelated to the manning question covered by the Arbitration Award. Upon motion of the railroads filed in the District Court, a supplemental temporary restraining order was issued on the same date, March 31, enjoining the BLF&E, and all others subject to the March 28 order, from striking, because "the said strikes may relate" to the manning disputes under the Arbitration Award. At the hearing on this motion for a supplemental order, counsel for the union again requested Judge Holtzoff to send the case to another judge, which request was denied. The supplemental order was also appealed to this court on a motion to stay, which we denied, and we dismissed the appeal on April 1, 1966.

On Saturday, April 2, the railroads filed in the District Court a motion for a show cause ruling for contempt against the BLF&E for failing to call off the strike. During oral argument on the motion the BLF&E again requested Judge Holtzoff to send the case to another judge, which request was again denied; and also moved for a jury trial under 18 U.S.C. Sec. 3692,[9] which was also denied. The contempt hearing came on that same afternoon, at which counsel for the union reiterated its requests. Both were denied. The request for a jury trial was denied (1) because 18 U.S.C. Sec. 3692 applied only to criminal contempt, and (2) because the statute

which was reenacted in Sec. 3692 had been held, in United States v. United Mine Workers of America, 330 U.S. 258, at 298, 67 S.Ct. 677, 91 L.Ed. 884 (1946), to apply only to cases to which the Norris-La Guardia Act [10] applied. The union's oral response was a "denial in full that we have committed any contempt whatever, in any way, of any order of this court, and secondly, that the outstanding order of this court is invalid." The District Court ruled as irrelevant proffers by the BLF&E regarding (1) the legality of the strike and the invalidity of the order, (2) whether there was a "substantial compliance" in that the union had tried to negotiate with the railroads on the conditions for a return of the men, and (3) whether the railroads had refused to bargain at all times prior to the grant of this equity injunctive relief. The BLF&E and its president, H. E. Gilbert, were found guilty of civil contempt, and a coercive fine "looking to the future as a means of compelling compliance" was imposed: $25,000 per day for the BLF&E and $2,500 per day for H. E. Gilbert, conditioned upon failure to terminate the strike by noon of the next day, Sunday, April 3. Late on Saturday, April 2, the BLF&E appealed the contempt order and filed a motion to stay. We dismissed the appeal on Sunday, April 3.

A motion to show cause why the fine should not be increased was filed on Sunday afternoon, April 3, with affidavits that the strike was continuing. A rule to show cause was issued for the next morning, Monday, April 4. However, on that morning the railroads moved to vacate the rule since the strike had terminated. The rule was vacated by an order presented by the railroads and issued by the District Court on April 6. On April 6, when counsel for the railroads presented the order to va-

8. In response to expression by the BLF&E of fear that the order would let the railroads "do anything they want," the District Court stated that if the railroads disturbed the *status quo*, they would be similarly restrained on application by the BLF&E.

9. 62 STAT. 844 (1948).

10. 47 STAT. 70 (1932), 29 U.S.C. §§ 101–115 (1964).

cate, the court commented that the order vacated only the rule to show cause (regarding increased fines) and that rights might have, and probably had, accrued under the restraining and contempt orders, but that the court did not take up such matters *sua sponte*.

On April 22, the BLF&E filed a motion to disqualify Judge Holtzoff under 28 U.S.C. Sec. 144,[11] accompanied by an affidavit of its president, H. E. Gilbert. This affidavit included allegations as to events on March 3, March 28, March 31, and April 2,[12] as well as to events on April 4 and 6. Appellants pursue on appeal the allegations pertaining to the events of April 4 and 6. The affidavit cited Judge Holtzoff's remarks during the April 6 hearing to vacate the rule to show cause as prompting the railroads to act to force union payment of contempt fines which had accrued. It also asserted on information and belief that on Monday, April 4, Judge Holtzoff had informed the press, with an admonition not to quote him directly, that union contempt fines had accrued. The motion to disqualify was denied for legal insufficiency of the accompanying affidavit.

On April 29, the railroads moved for an order "assessing fines for failure to terminate contempts." At the same time they moved also for an order awarding them compensatory damages. During a May 4 hearing on the merits case, Judge Holtzoff clarified, in regard to the fine assessment motion, that only one day's fines were shown to have accrued by the facts as related in that motion. On May 6, the BLF&E filed its opposition to the railroad's April 29 motion, maintaining (1) that the railroads lacked standing to institute assessment proceedings on what were really punitive rather than coercive fines; (2) that the BLF&E

and its president were due a jury trial under 18 U.S.C. Sec. 3692; (3) that they had "substantially complied" with the order; and (4) that, again, the original contempt order of April 2 was invalid for all of the reasons previously enunciated in opposition to that order. The motion was set for hearing on June 17.

On June 9, a hearing was convened, initially for the purpose of deciding whether the motion should be heard as previously scheduled on June 17, or in the early fall. The railroads favored such a postponement but the BLF&E requested that the hearing proceed on June 17 on the coercive fine portion of the motion. Judge Holtzoff, however, immediately entered an oral judgment for the two coercive contempt fines for the one day's duration of the contempts, which he reiterated in a written opinion of the same date, June 9. 255 F.Supp. 476 (D.D.C.1966). Regarding these fines, Judge Holtzoff ruled that his earlier rulings had already established that the union and its president were guilty of contempt and that their desire for negotiation was not an excuse for failure to comply with his order to end the strike; that those rulings had already imposed the coercive fine and that this was a ministerial action; and that the rulings had closed to further argument the questions of regularity of the procedures, the validity of the orders, and jury trial. Counsel for the BLF&E and its president contended that the earlier orders had not in fact been affirmed by this court but, rather, were dismissed as not appealable. He declared that he wanted to prove substantial compliance, and challenged the affidavits accompanying the railroads' motion to assess the fines.

---

11. 62 STAT. 898 (1948), as amended, 63 STAT. 99 (1949).

12. These matters, not presented on appeal here, were that the trial judge's March 3 opinion in solely a trainmen's case adversely adjudicated the rights of the firemen; and also that at the original March 28 temporary restraining order hearing, at the March 31 supplementary order hearing, and at the April 2 contempt hearing, the trial judge refused to allow union counsel to put on the record his reasons for requesting transferral to another judge.

It is this judgment of June 9 and subsequent order of June 15 assessing fines which the BLF&E and its president now appeal. They challenge the failure to disqualify, the validity of the early underlying orders and procedures, the lack of jury trial, the failure to find substantial compliance, the availability of the injunction under the Norris-La Guardia Act, and the finding that the strike was "unlawful."

## I

### Motion to Disqualify

On the record, union counsel first requested Judge Holtzoff to send these proceedings to another judge during the original March 28 temporary restraining order hearing. This request was repeated during the March 31 supplemental order hearing, at the April 2 hearing on the original contempt rule to show cause, and again at the hearing on the return that same afternoon, April 2. All of these requests were denied. At the afternoon proceeding on April 2, in reply to the request for transfer, Judge Holtzoff stated: "This is merely a proceeding to enforce a restraining order and it is purely impersonal." The motion to disqualify under 28 U.S.C. Sec. 144 was filed on April 22, with the accompanying affidavit of BLF&E president, H. E. Gilbert. Judge Holtzoff overruled the affidavit as insufficient that same afternoon in these words:

"[A]n affidavit of bias and prejudice must show personal bias and personal prejudice against the party. That affidavit doesn't show it at all."

Appellants argue the disqualification issue before this court only as to the affiant's allegations of prejudicial events on April 4 and 6 regarding, respectively, (1) an alleged statement by Judge Holtzoff to the press on Monday, April 4, that fines were then due and payable; and (2) his statements, made while hearing the submitted order to vacate the April 3 show cause rule to increase fines, to the effect that rights had accrued under the contempt order, but that such matters must be initiated by counsel.

■ The disqualification statute, 28 U.S.C. Sec. 144,[13] is mandatory and automatic, requiring only a timely and sufficient affidavit alleging personal bias or prejudice of the judge. The judge is a silent defendant, unable to make findings on the truth or falsity of the affiant's allegations. The truth and good faith of such allegations must be presumed in so far as the affiant is concerned, United States v. Hanrahan, 248 F.Supp. 471, 474 (D.D.C.1965); and the allegations may be based upon information and belief, Berger v. United States, 255 U.S. 22, 34, 41 S.Ct. 230, 65 L.Ed. 481 (1920).

"If the affidavit, application and certificate of counsel comply with the statutory standards, the judge has no alternative but to recuse himself, no matter how defamatory the charges may be and even if they are known to the Court to be false." United States v. Hanrahan, 248 F.Supp. at 475.

■ On the other hand, the statutory standards and safeguards against misuse of this statute are necessarily stringent and must be strictly enforced. The motion and affidavit must be timely filed, show a true personal bias, and must allege specific facts and not mere conclusions or generalities. Inland Freight

---

13. 28 U.S.C. § 144:

"Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.

"The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists, and shall be filed not less than ten days before the beginning of the term at which the proceeding is to be heard, or good cause shall be shown for failure to file it within such time. A party may file only one such affidavit in any case. It shall be accompanied by a certificate of counsel of record stating that it is made in good faith."

Lines v. United States, 202 F.2d 169 (10th Cir. 1953); Simmons v. United States, 302 F.2d 71 (3d Cir. 1962).[14]

■ Preliminarily, the oral requests for transfer made during the temporary restraining order proceedings of March 28, the supplemental restraining order proceedings of March 31, and the morning and afternoon contempt proceedings of April 2 do not suffice as proper motions to disqualify under 28 U.S.C. Sec. 144.

■ Secondly, the motion to disqualify and the allegations contained in the accompanying affidavit argued on appeal are legally insufficient to have required the judge to recuse himself in this case. Aside from its essential omission in not specifying any fact indicating personal prejudice, allegation No. 7 of the affidavit (that on April 4 Judge Holtzoff had informed the press that "fines had accrued automatically because the union remained on strike for about 12 hours after the deadline * * * [and] were now due and payable," and that the statements to the press "were made under the restriction that the press not quote Judge Holtzoff directly,") is to a degree, of course, controverted by the very event subsequently alluded to and cited by the affiant—the later statements by the judge in open hearing on April 6 indicating that the fines would not be payable until an assessment-collection action was brought. While sufficiently made on information and belief, Berger v. United States, *supra*, 255 U.S. at 34, 41 S.Ct. at 233, this allegation shows "no more than an expression of prior opinion on a legal question," which was held in Loew's, Inc. v. Cole, 185 F.2d 641, 646 (9th Cir. 1950), to be not within the statute.[15] At most, it seems, Judge Holtzoff was expressing

his opinion regarding the law *after* he had made an adjudication and issued a conditional contempt order. Such a statement cannot be characterized as "a prejudgment that contempt defendants have violated his restraining order," as alleged by appellants, since the contempt finding had been made *earlier* and the fines coercively set. It was fine collection or assessment, upon continuance of this contemptuous strike, which lay ahead.

■ Appellants' allegation No. 8 is directed towards and cites Judge Holtzoff's assertions during the April 6 hearing on the order to vacate the show cause rule for increased fines, that rights might have accrued, and probably had accrued, under the contempt order; and his statement that consideration of the matter of fines must be initiated by counsel and could not be handled by the court *sua sponte*. The allegation that this "actually prompted the railroads to act to force payment" is deficiently conclusory. Inland Freight Lines v. United States, *supra*. The language itself reflects no prompting, no embroilment in the "accusatory process." [16] Nor did Judge Holtzoff "[take] a position apparently inconsistent with an ability to judge the facts fairly". Texaco, Inc. v. F.T.C., 118 U.S.App.D.C. 366, 336 F.2d 754 (1964).

■ Having found the affidavit legally deficient, we need not and do not pass upon appellees' contention that appellants waived their rights under 28 U.S.C. Sec. 144 or that the motion and affidavit were untimely filed. Finally, we do not pass upon appellees' contention that the motion and affidavit seeking disqualification were also deficient for failure to include the required certificate of counsel of his own good faith as

14. A thorough and accurate review of the law in this area was set out by the District Court in this circuit in United States v. Hanrahan, *supra*.

15. Scott v. Beams, 122 F.2d 777 (10th Cir. 1941), cert. denied, Tiger v. Beams, 315 U.S. 809, 62 S.Ct. 794, 86 L.Ed. 1208 (1942), and In re Union Leader Corp.,

292 F.2d 381 (1st Cir. 1961), concern, respectively, less blatant and more blatant expressions by trial judges than that alleged here, both of which were held insufficient to invoke Sec. 144.

16. Compare In re Murchison, 349 U.S. 133, 75 S.Ct. 623, 99 L.Ed. 942 (1955).

well as that of the affiant, nor that the certification improperly failed to apply to the motion as well as to the accompanying affiant. We do recognize, although we do not pass upon it here, that proper certification is a vital and significant requirement to prevent abuse of Sec. 144.[17]

## II

### Denial of Basic Constitutional and Statutory Rights

Appellants further and variously contend (1) that the June 9 judgment and June 15 order assessing fines were themselves punitive "imposition" of such fines, and so constituted a separable criminal contempt action; (2) that they were therefore wrongfully denied a jury trial in a criminal contempt action and denied their right to allocution, since they were not present at their "sentencing" on that occasion; (3) that even if this were not a criminal contempt proceeding, they were entitled to a jury trial under 18 U.S.C. Sec. 3692, which provides for jury trials in labor dispute contempt cases; and finally (4) that they were denied due process by the lack of proper notice and a full hearing in the June 9 fine assessment proceeding.

■ We cannot agree that these proceedings evolved, at any stage, into a criminal contempt action. The June 9 proceeding was not that at which these coercive fines were in fact "imposed." The appellants, therefore, were not wrongly deprived of a contempt jury trial on that basis. Nor were they due a jury trial here under Sec. 3692. Every civil contemnor is entitled, however, to those fourteenth amendment safeguards applicable to all judicial proceedings, and if it can be found that appellants did present a genuine issue of fact regarding their substantial compliance or inability to comply with the District Court's orders,[18] they had a due process right to a full, impartial hearing with notice and an opportunity to present this defense.[19]

■ (1) Appellants conceded, and indeed argued, in their brief and at oral presentation, that this was initially a civil contempt proceeding, both in form and in procedure. They contend, however, that the June 9 assessment proceeding was criminal in nature because the unions had by that time returned their men to work and therefore held no "key" to their own exoneration from what was then a punitve action. Actually, at the earlier proceeding on April 2, a clearly conditional and coercive *per diem* fine had been imposed to insure that the previous orders of the court would be complied with as of a specified future date. The June 9 proceeding and June 15 order assessed the very fines which had been conditionally imposed on April 2. This, then, is not the situation presented in Flight Engineers Internat'l Ass'n, etc., v. Eastern Air Lines, Inc., 301 F.2d 756 (5th Cir. 1962), upon which appellants rely. In that case, a contempt was adjudicated and a fine subsequently imposed, both *after* the contemptuous acts had ceased, without any possible coercive motive or characteristic, since the date for compliance had passed. In the case now before us, the fine-imposing proceeding, to coerce compliance, set a *future* performance date. A later assessment of the fines so imposed, upon a showing of non-compliance, is not sufficient to require the classification of such an assessment as separately punitive. Certainly, the characteristic of a coercive civil contempt action is not abandoned when, although both the adjudication of contempt and imposition

17. It has been generally held under this statute that counsel should properly certify in such motions as to his own good faith as well as to the good faith of the affiant. See United States v. Hanrahan, *supra.*

18. Either of these situations, well proven, would be a complete defense to a coercive contempt proceeding. Maggio v. Zeitz, 333 U.S. 56, 68 S.Ct. 401, 92 L.Ed. 476 (1945).

19. See Parker v. United States, 153 F.2d 66, 163 A.L.R. 379 (1st Cir. 1946).

of the fine are coercively prospective, the final assessment of such coercively imposed fines does not occur prior to the termination of the contemptuous act. Because a question of fact must be determined at this assessment proceeding (that of non-compliance by the specified performance date), the proceeding does not necessarily become a punitive, criminal action wherein the recalcitrant party must be afforded the procedural safeguards of a criminal contempt charge.[20]

▮ Failing to be criminal or punitive in nature, these proceedings could at no stage compel a jury trial on that basis, nor could they support appellant's claim of a wrongful denial of the allocution right granted to criminal defendants to be present and heard at the time of their "sentencing."

▮ (2) Nor are appellants entitled, under 18 U.S.C. Sec. 3692,[21] to a jury trial at these proceedings assessing previously imposed civil, coercive fines. First, like all of the general federal contempt statutes,[22] it is not clear from the language of this provision whether it applies solely to criminal contempt or is applicable also to civil contempt proceedings, as appellants here contend. It would seem, however, that the accepted view is that this limitation is not applicable to a civil contempt case.[23] No case of which we are aware has held to the contrary,[24] and we are not persuaded that the rule should be otherwise. The fact that, since the completed revision in 1952 of Titles 28 and 18, *all* of the general federal contempt statutes have been placed in Title 18, Crimes and Criminal Procedure, seems to indicate that these provisions are applicable only to cases of criminal contempt. Appellants cite various statutes containing specific contempt provisions, to show that Congress can and does distinguish between procedures for civil and criminal contempt when such is its intent. However, none of those statutes appears under the criminal title in the first instance.

It is established, and here uncontested, that 18 U.S.C. Sec. 3692 is the 1948 reenactment of former Section 11 of the Norris-La Guardia Act.[25] Judicial interpretations and legislative history regarding that provision are, therefore, applicable and directive regarding its reenactment in Section 3692.[26] In interpreting both former Section 11 of Norris-La Guardia and former Section 22 of the Clayton Act, 18 U.S.C. § 402 (1964), *formerly* 38 STAT. 738–739 (1914), the jury trial provisions of which are now included in 18 U.S.C. § 3691 (re-

---

20. Cheff v. Schnackenberg, 384 U.S. 373, 380, 86 S.Ct. 1523, 16 L.Ed.2d 629 (1966), has established what the Supreme Court suggested in United States v. Barnett, 376 U.S. 681, 84 S.Ct. 984, 12 L.Ed.2d 23 (1964), that other than petty criminal contempt sentences will no longer be imposed by federal courts unless a jury trial has been received or waived.

21. 18 U.S.C. Sec. 3692: "In all cases of contempt arising under the laws of the United States governing the issuance of injunctions or restraining orders in any case involving or growing out of a labor dispute, the accused shall enjoy the right to a speedy and public trial by an impartial jury of the State and district wherein the contempt shall have been committed."

22. 18 U.S.C. Sec. 401 (power of court); 18 U.S.C. Sec. 402 (contempts constituting crimes); 18 U.S.C. Sec. 3691 (jury trial of contempts which also constitute criminal offenses).

23. *Contra, Civil and Criminal Contempt in Federal Courts*, 17 F.R.D. 167, 174 (1955); see Cong.Rec. 6337, 6453 (Remarks of Senators Norris and Dyer).

24. But see Penfield Co. of Cal. v. S.E.C., 330 U.S. 585, 67 S.Ct. 918, 91 L.Ed. 1117 (1947), which assumed *arguendo* that 18 U.S.C. Sec. 401 (1948) ("power of court" statute) would be applicable to a civil contempt case. In two recent federal cases in which the issue could have been presented, a jury trial under Section 3692 was denied instead, on the ground that they were not true labor dispute cases. In re Piccinini, 35 F.R.D. 548 (W.D.Pa. 1964); Mitchell v. Barbee Lumber Co., 35 F.R.D. 544 (S.D.Miss.1964).

25. See Reviser's Note to 18 U.S.C.A. Sec. 3692 (1958); H.R.REP.No. 304, 80th Cong., 1st Sess. 9, A 176; H.R.REP.No. 152, 79th Cong., 1st Sess., A 164.

26. See United States v. Barnett, *supra* note 20.

garding jury trial of contempts which also constitute criminal offenses), Russell v. United States, 86 F.2d 389 (8th Cir. 1936), stated that statutes which so limit the inherent judicial power to try contempts without juries should not be construed to extend beyond their clear terms. In Michaelson v. United States, 266 U.S. 42, 45 S.Ct. 18, 69 L.Ed. 162 (1924), the Supreme Court construed this former enactment of Sec. 3691 to be limited to criminal contempt proceedings although, as in Sec. 3692, that provision nowhere expressly excluded civil contempt proceedings. The Supreme Court was clearly concerned with the "authority of Congress to set aside the settled rule that a suit in equity is to be tried * * * without a jury," 266 U.S. at 65, 45 S.Ct. at 19—a possible conflict which, of course, we could not ignore if we construed Sec. 3692 to be not limited to criminal contempt proceedings. Finally, we note that the House Report on the 1948 revision of Title 18 describes that revision as an addition of "those criminal provisions in other titles." H.R. REP. No. 304, 80th Cong., 1st Sess. 1.[27]

Secondly, and decisively, we feel that Sec. 3692 applies only to those contempt proceedings arising from injunctions governed by the Norris-La Guardia Act,[28] which, as we discuss below, does not apply to prohibit or govern injunctive proceedings regarding acts determined to be violative of the Railway Labor Act.[29] Such was the rationale of the District Court injunctive proceedings here before us. That the scope of Sec. 3692 is to be limited to contempts of

injunctive orders governed by Norris-La Guardia is indicated, it would seem, by the very legislative debates concerning former Section 11 which appellants claim are persuasive that its reenactment should apply to both civil and criminal cases. Note 20 *supra*. In United States v. United Mine Workers, 330 U.S. at 298, 67 S.Ct. at 698, the Supreme Court held that former Section 11 applied only to cases arising under the Norris-La Guardia Act, and cases subsequent to the enactment of Sec. 3692 have similarly limited this reenactment of former Section 11. Madden v. Grain Elevator, etc., Workers, 334 F.2d 1014 (7th Cir. 1964) (inapplicable to proceedings under the Labor Management Relations Act); Mitchell v. Barbee Lumber Co., 35 F.R.D. 544 (S.D.Miss.1964) (Sec. 3692 represents a reenactment of former Section 11). It is not applicable to an injunction issued to aid in enforcement of the Railway Labor Act.[30]

▮▮▮ (3) Appellants' contention that appellees here lacked standing to initiate the motion to assess these conditionally imposed fines is also unacceptable. Appellants' arguments regarding lack of standing beg the question of whether this is a criminal contempt action (wherein private parties would unarguably lack standing to initiate such proceedings), FED.R.CRIM.P. 42(b), a question we have disposed of above. Upon noncompliance with a coercively sanctioned order, the party for whose ultimate benefit it was issued, who has been seeking the civil remedy for its own benefit, should, it seems, be able

27. MOORE'S FEDERAL PRACTICE, Sec. 38.-33 (1) and (2), concluding that there is no such statutory right to jury trial in civil contempt cases under, *inter alia*, *18 U.S.C. Sec. 3692*.

28. Note 9 *supra*.

29. 44 STAT. 577 (1926), as amended, 45 U.S.C. Secs. 151–188 (1964).

30. See cases cited note 38, *infra*, The Norris-LaGuardia Act applies to cases of injunctions "involving or growing out of a labor dispute" and denies jurisdiction to United States courts unless certain

showings are made, see 29 U.S.C. § 107 (1964). The term "labor dispute" is broadly defined, see 29 U.S.C. § 113(c) (1964). But in essence that Act denies jurisdiction to issue the kind of injunction theretofore issued by federal courts in diversity cases on a showing of illegality under common law due to fraud or breach of contract. In all such cases where the conditions are met, contempts are subject to jury trial. But these provisions do not limit injunctions provided for by or issued in aid of other federal statutes in the labor relations field, including the Railway Labor Act.

to institute such an assessment proceeding. Undoubtedly, a coercive contempt order includes a benefit to the plaintiff by coercing compliance with an order entered in its behalf.[31] McCauley v. First Trust & Savings Bank, 276 F. 117 (7th Cir. 1921), upon which appellants rely to exemplify an unallowable contempt motion by an "incompetent" party, is inapposite. That was a declared criminal contempt situation.

(4) Like any civil litigant, a civil contemnor is, however, clearly entitled to those due process rights, applicable to every judicial proceeding, of proper notice and an impartial hearing with an opportunity to present a defense.[32] Judge Holtzoff indicated this at the Supplementary Restraining Order hearing of March 31. There he told appellants that they would be due a hearing if they violated his restraining orders. We do not find infringement of this principle in either of the proceedings imposing the initial or supplementary orders of March 28 and 31, nor in the April 2 finding of contempt. Appellants were simply limited in those proceedings to the issue before the court in each instance and were not permitted to enlarge the scope of such hearings to include argument on the validity of the underlying orders or to contend that further negotiation on the terms for a return to work constituted satisfactory compliance. If, however, it can be said that, during the June 9 hearing at which the judgment assessing the previously imposed fines was entered, appellants raised a genuine issue of fact regarding compliance, they were entitled to a hearing on that issue. While it seemed apparent that the men were not back at work by this deadline, that was not, as appellees would contend, the only issue. To that extent, the District Court was incorrect in stating at the June 9 hearing that "there is no issue to try * * * because the picket lines were still on after Sunday noon." Either compliance or inability to comply is a defense in coercive contempt proceedings. Maggio v. Zeitz, *supra*. During the proceedings of April 2 and June 9, counsel for appellants argued, variously, that the unions "have made every effort to comply with that order"; that they had "substantially complied with the order of the Court in * * * efforts to settle the strike"; and that they "did in fact * * * send a telegram * * * ordering them to call off the strike."[33] In-

31. See *Civil and Criminal Contempt in Federal Courts*, note 23 *supra*, 17 F. R.D. at 172. The alternative would be to say that appellees here lacked standing to move for assessment of these previously imposed coercive fines because the contemptuous strike had already ceased, and they would therefore gain no further civil remedy for themselves (the return of men to work their railroads). This, of course, would narrow the standing of such parties to move assessment of such conditionally imposed fines to situations where the already adjudged contempt was continuing—which might, in effect, call for a new such motion for each day of a continuing contempt in order to put teeth into this coercive device. Otherwise, by waiting until the contemptuous action has ceased, the party who is supposed to benefit thereby is denied an interest, suddenly, in seeing these imposed and accumulated fines enforced; and only the Government, recipient of such coercive fines, is left with standing to move as-

sessment of these fines, as in cases of criminal contempt. This might seem proper except that, clearly, the coercive contempt device has a basic function, apart from vindication of the court's authority, as in criminal contempt, of preserving a benefit for or preventing harm to the second party to the action. To deny them standing to see that imposed coercive fines will be assessed, would seem to go far towards emasculating the coercive effect of the imposition of such fines, since the likelihood of their assessment would be reduced.

32. Parker v. United States, *supra*.

33. More completely, the remarks of counsel for appellants at the afternoon hearing of April 2 were as follows:
"* * * we have made every effort to comply with that order by negotiating with the railroads for an orderly return to work under the usual conditions of such return from strikes in the

deed, counsel for the railroads, at the June 9 proceeding, noted the following:

"* * * [Counsel for the unions] makes the point, in opposition to any fines for contempt, that defendant substantially complied with the order of the Court in its efforts to settle the strike, which were frustrated and rebuffed by these plaintiffs, so that no fine may properly be assessed against it.

"He is apparently seeking to raise issues of fact * * *."

Counsel requested detailed particulars and a proffer of proof to see if what the union counsel proposed to prove was in fact relevant.

We do not suggest that mere attempts to further negotiate terms for a return to work would be a compliance with the orders of the District Court. Judge Holtzoff correctly held at the June 9 hearing that "the mere fact that you were negotiating does not constitute compliance with the order." [34]

 However, it would appear that it is possible that counsel for appellants was urging a more absolute "substantial compliance," or an inability to comply, with the District Court's unconditional order to call off the strike and return to work. At any rate, it is not apparent that the hearing of June 9 was free from this contested factual issue, and the hearing to which appellants would thus be entitled was not provided by what was initially to have been simply a proceed-ing to set the date for a full hearing on the fine assessment motion. Instead, the District Court made an immediate finding on the motion on the basis that there was "no issue to try." Certainly the history of contempt litigation, especially in regard to labor disputes, prescribes extreme care and insistence on the full indicia of due process in contempt cases. In such instances, not only must the District Court consider whether there is indeed a contempt but also whether if so, it be of such magnitude as to warrant retention, in part or to any extent, of the coercive fine originally provided for in contemplation of an outright refusal to obey. Flexibility in approach will permit consideration of the complexity of the outstanding order, possible ambiguities, the difficulties in arranging compliance and the extent of efforts to obey its terms. That a hearing on such aspects is or can be of great importance can scarcely be gainsaid.

### III

### Applicability of *Mine Workers* and Norris-La Guardia Act

Finally, we give brief consideration to appellants' challenge to the substantive legality of the District Court's underlying restraining orders of March 28 and 31. Specifically, appellants contend that Section 4 of the Norris-La Guardia Act [35] was applicable to this labor dispute case to deprive the trial court of the injunctive jurisdiction requisite to issue such orders.

railroad and other industries in the United States."

* * * * *

"* * * Mr. Gilbert told the press that he was ordering the men to go back on the usual conditions. I think that is all your order requires and that is all that a reasonable interpretation of it should be. * * *"

At the hearing of June 9, the remarks of counsel for appellants were as follows:

"But I would like to put on the record an offer of proof, that the Brotherhood substantially complied with the order of the Court in its efforts to settle the strike, which were frustrated and re-buffed by the railroads. In other words, I say an issue of fact, we did comply with the order and we are enti-tled to a trial on that."

* * * * *

"I respectfully suggest we are entitled to a trial on the question whether we did in fact make such an order, be-cause we did in fact, right after twelve o'clock that day, send a telegram from Cleveland to the different places, order-ing them to call off the strike."

34. Much of the language of union's coun-sel in this regard during both the April 2 contempt hearing and the June 9 fine assessment hearing suggests that the or-der to return to work permitted nego-tiation of the "terms and conditions of return."

35. 29 U.S.C. Sec. 104 (1964).

First, appellants felt it to be requisite, as a premise to disputing the validity of the District Court's restraining orders, to establish that they were not precluded under any doctrine of United States v. United Mine Workers, *supra,* from so challenging the underlying order in a *coercive* civil contempt proceeding. The *Mine Workers* case dealt with, and has become a basis directive in regard to, the right of defendants in criminal and *compensatory* civil contempt proceedings to attack the validity of the underlying orders on which the alleged contempts are based. That case did not, however, specifically deal with a coercive civil contempt order in this regard.[36]

It would appear to be fallacious to hold that the efficacy of coercive civil fines is to be governed by the compensatory fine rationale of *Mine Workers,* which allows alleged contemnors to challenge the propriety of the underlying order in defense of their otherwise contemptuous disobedience of that order.[37] Certainly, a prospective, coercive fine, short of an absolutely imposed punitive sanction but beyond the remedial function of a compensatory fine, will serve to preserve the court's "power to order maintenance of a *status quo,*" only to the degree that litigants are prevented from pre-judging the validity of that court's orders. Rather, as is true of punitive fines under *Mine Workers,* it would seem that prospective, coercive fines should be enforceable despite a subsequent determination by the District Court, or on appeal, that the disregarded order was in fact beyond the ordering court's jurisdiction.

Such an analysis is not, however, critical or determinative in the case now before us, because we find that the Norris-La Guardia Act does not apply to preclude these underlying temporary restraining orders. It is not here disputed that Norris-La Guardia Act will not apply to preclude injunctive relief in cases in which the acts to be enjoined are in violation of the Railway Labor Act.[38] Additionally, any test of the applicability of the Norris-La Guardia Act to the issuance of a temporary restraining order must be mindful of the general standards governing the issuance of temporary orders of this nature, as opposed to the issuance of permanent or even preliminary injunctions. Whether or not any provision of the Railway Labor Act had been violated by either or both of the opposing parties, was and is precisely the subject of the consolidated merits case. Determination of that issue will, in turn, be dispositive of whether the strike here temporarily restrained was actually in violation of that Act. The purpose of the March 28 and 31 restraining orders was simply, it would seem, to preserve the status quo in light of a public interest in avoiding a major rail strike which was possibly in violation of "positive mandates" of the Railway Labor Act. Certainly, as noted, if the strike was so illegal, Norris-La Guardia Act would not apply to deprive the District Court of jurisdiction to enjoin it.[39] We are not required here to de-

36. In *Mine Workers,* the civil contempt judgment of the District Court, which the Supreme Court indicated that it would have set aside, was a flat $3,500,000 remedial, compensatory fine, none of which was coercively conditional upon a failure to terminate the strike there in issue. The plaintiff was there clearly to "profit by way of a fine" under the District Court order. 330 U.S. at 295, 67 S.Ct. at 696.

37. Compensatory fines provide relief for damages sustained through the contemnor's violation of a court order—a sufferance which in a legal sense, of course, can not be said to exist if the underlying order was invalid. "But where the purpose is to make the defendant comply, the court's discretion is otherwise exercised." 330 U.S. at 304, 67 S.Ct. at 701.

38. See Virginia Ry. v. System Federation, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789 (1937); Graham v. Bhd. of Locomotive Firemen and Enginemen, 338 U.S. 232, 70 S.Ct. 14, 94 L.Ed. 22 (1949); Bhd. of Railroad Trainmen v. Chicago R. & Ind. R.R., 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed. 2d 622 (1957).

39. Bhd. of Railroad Trainmen v. Chicago R. & Ind. R.R., *supra* note 38, at 39–42, 77 S.Ct. at 639–641.

cide the legality of this strike under the Railway Labor Act in order to uphold the issuance of a temporary restraining order by the District Court, which felt that there was a possibility that the strike would so be in violation of the mandates of that statute—as evidenced and enforced by its subsequent finding to that effect in the merits case which was then before it. The appellee-railroads were contending that the strike was illegal precisely because in abrogation of the Railway Labor Act. That was the statutory source of this contested issue.[40] The Norris-La Guardia Act does not, therefore, properly apply here to preclude the initial interlocutory relief of these temporary restraining orders of March 28 and 31.

Accordingly, it follows that the case will be remanded to the District Court for a hearing to the extent set forth in Part II (4) of this opinion.

So ordered.

40. Compare Bhd. of Railroad Trainmen v. Atlantic Coast Line R.R., 362 F.2d 649 (5th Cir. 1966), affirmed, 385 U.S. 20, 87 S.Ct. 226, 17 L.Ed.2d 20.